May it please the Court, Morgan Goodspeed on behalf of Appellant G. E. Betz. There are a number of claims in this case, so I hope to focus this morning on three specific legal errors. First, the District Court wrongly refused to enforce a non-solicitation agreement between G. E. Betz and Ms. Moffitt-Johnston. Second, the District Court wrongly awarded attorneys' fees without making any of the required findings. And third, the District Court wrongly excluded a critical piece of evidence before it later admitted that same evidence at trial. So, turning first to the enforceability of the non-solicitation agreement here. Can I ask you a question about the evidence first? Of course, Your Honor. You say in your briefs that she contacted, is it Mr. Hampton? Tell me exactly how, did a client contacted Ms. Moffitt-Johnston, a former client of G. E., a former customer, and then did she contact Hampton or tell the client to contact Hampton? What's the evidence about that? And can you tie a sale from that purchaser or that client to Hampton? I take your honor to be referring to the evidence about a violation of the non-solicitation agreement, and I think probably Hagstrom is the name that you're thinking of here. So, the evidence of an actual violation of that agreement in this case included a number of conversations. And can you tie that violation to a specific sale? Sure, Your Honor. One example would be the client Stott Oil. So, there was testimony that Ms. Moffitt-Johnston had a conversation with a client Stott Oil and that there was shortly thereafter. At the Harbor Yacht Deal, but I'm asking specifically about Mr. Hagstrom. Mr. Hagstrom, there was testimony that Mr. Hagstrom spoke with a number of G. E. clients and that there have since been a number of sales to G. E. clients. Okay. And he was not under a non-compete agreement? That's correct, Your Honor. He could do that lawfully, no problem. Well, Your Honor, there is . . . That's my question. Is there evidence that she referred a former G. E. buyer, purchaser, to Mr. Hagstrom and that Mr. Hagstrom made a sale to that client? Your Honor, there is evidence from Mr. Hagstrom himself that Ms. Moffitt-Johnston and Mr. Hagstrom referred clients to each other. And then there is evidence that there were sales made thereafter to G. E. clients. To the clients, to the specific clients that she referred to Hagstrom. You got to make the connection there for damages now. If you were talking about injunction, I'd be with you. I need to hear about evidence for damages from Moffitt-Johnston to Hagstrom, Hagstrom made the sale. Sure, Your Honor. There is not evidence from Mr. Hagstrom as to which specific clients, although it's clear if Your Honors look at the sealed record at 5906 to 5925, there's an extensive list of G. E. clients included among AmSpec's financials. And I should also add that the sales through Mr. Hagstrom, this subterfuge idea, is only one of the two theories G. E. had for a breach of the non-solicitation agreement. I just want you to give me your best evidence about Hagstrom. Sure. It would be Hagstrom's testimony himself that Ms. Moffitt-Johnston referred clients to him. In addition, testimony that, or excuse me, evidence that Mr. Hagstrom updated Ms. Moffitt-Johnston on his sales activities, and those combined with subsequent sales to G. E. clients. And so how do you prove damages from that testimony? Which client, how much, how do you quantify your damages from that testimony? Sure, Your Honor. Presumably, G. E. would put Mr. Hagstrom on the stand and ask specifically whether he recalls communication. Well, this isn't presumable. You had full discovery and you were denied a trial and you had to raise some triable issue of fact on damages. So tell me your evidence how you get to a jury on damages from that specific scenario. Your Honor, again, there would be an overarching damages argument here based on the number of G. E. clients that were lost. And on damages too, we could just focus too on the specific communications from Ms. Moffitt-Johnston with Statoil followed by specific Statoil sales. That was one of the clearest lines that G. E. drew in order to give an example. How do we know that she didn't say anything at that yacht day to the client other than how your children, how's your wife, how's your golf game? Your Honor, that might be a possible inference for the jury to draw, but the point that G. E. was making is that it was not simply providing direct evidence of what may or may not have been said in that conversation. What it was providing was serious circumstantial evidence that showed that Ms. Moffitt-Johnston left G. E. to come . . . Had you gone in and gotten an injunction right then and said no more contact with her and made it . . . if you were arguing for an injunction, I hear you, but you're talking about what you have to prove to a jury to get damages. Your Honor, G. E. was not able to get an injunction in this case precisely because the district  would not be solicited and that broke down and you never went back into court and asked for anything. It's true that the record doesn't show an ultimate list, but that discussion followed the district court making clear that she was not going to approve an injunction in this case because she incorrectly felt that this agreement was unenforceable as a matter of Texas law. Really that was a result of two errors in her reasoning under Texas law. The first is that she was requiring the agreement to do more than simply specify that it applied to clients with whom Ms. Moffitt-Johnston had had contact. That's the accepted rule under the Texas Supreme Court decision in Pete Marwick v. Haas. The district court imposed this additional gloss that said not only must an agreement say it applies only to the clients with whom there's been contact, but it must also say that it applies to some subset of that client, to specific individuals or specific divisions. That's simply never been a requirement under Texas law. In fact, Texas law suggests to the contrary. Alex Shishunoff, for example, is one of the few Texas Supreme Court decisions we have here, and that case involved banks, large financial institutions, and there was never a suggestion that an agreement could only cover some smaller portion of those clients. But I don't know that Shishunoff actually speaks to this. How would the former employee know who they couldn't talk to? Well, Your Honor, the former employee presumably has some sort of memory of the clients she had communications with. So it has to be ones that she personally ... I thought you argued that the injunction covers anybody that GE is doing business with. No, Your Honor. And only a voice that she has personally called on. Correct. And that's the critical ... And she's supposed to remember that and know that, right? Is that what you're saying? Or, Your Honor, in the ordinary course, perhaps she would ask GE for a list or something to that effect. But it's very key that the agreement does ... It's at tab eight of your record excerpts, although I admit it's a little hard to read there. It's also quoted at record 24 to 26. In sections 1B and 1C of the agreement, it defines the customers covered by the agreement as those with whom Moffitt Johnston has had specific contact. And so that's the key distinction in Texas law if you compare cases like Gallagher Healthcare versus Hardy versus Mann. Right. And I didn't know that you had limited yourself so. Correct, Your Honor. And that's why we believe the district court was wrong here because ... Does this limit yourself so on its face by the terms of the agreement? It does, Your Honor. Section 1B and 1C, although there is a lot of sort of contractual language including synonyms and the like, you can see that the term customer includes specific customers with whom I had any contact or communication or about whom I developed, received, or learned confidential information. I thought it said customers, any current customer of the company. Correct, Your Honor, but after that including clause, it's any current customer of the company with whom I had any contact or communication. And so on its face, it is limited to ... I thought it says with any customer or prospective customer regarding products or services that are similar to or competitive with those I have gained knowledge of while employed by the company. That's correct. It doesn't say with whom I've had contact. Excuse me, Your Honor, I'm bringing in the definition of customer, which is Section 1B. 1B then defines customer as a ... Any current customer of the company including representatives of the customer, key decision makers, plant managers, et cetera. With whom I had any contact or communication or about whom I developed, received, or learned confidential information. ROA 1077, the definition of customer. Correct. It does not ... Your Honor, it's also in a tab eight of your agreement. If you ... Excuse me, tab eight of our record excerpts. It's Section 1B defines the term customer. Section 1C defines prospective customer and also does so in a way that limits it to clients with whom Ms. Moffitt-Johnson has specified contact. Those are also ... It's a bit illegible, the agreement itself. That's also quoted more in full in our complaint at 24 to 26 in the record. That's the key here is that the term customer, and I don't think this is something appellees have ever disagreed with, that the term customer limits the agreement to the clients with whom Moffitt-Johnson had contact. The district court was wrong to require something more. It also required an actual admissible list of those customers. That's something that's relevant to an injunction but doesn't relate to the enforceability of the agreement on its face. Even if this court were to find that the agreement is enforceable, which for these reasons we do not believe it is, at a minimum the court must reverse the award of attorney's fees. The district court made none of the required findings under Texas Business and Commerce Code 15.51c and in fact ordered an award of attorney's fees that as far as we can tell has no basis in the party's filings. I'd like to turn to the third key error here, unless Your Honor has additional questions about the enforceability of the agreement. And that error relates to the data loss prevention report or what we've called the DLP report. What the DLP report is, is a complete report of all actions taken on Ms. Moffitt-Johnson's computer during her last 90 days at GE. And the district court initially excluded this report thinking that it was an impermissible summary under Rule 1006, but then ultimately admitted the same report at trial. So we submit that there is no cause for deference here as there would be in the ordinary case in reviewing an evidentiary determination. And in any event, even if the ordinary standard were to apply, there's clear legal error here. I'm sorry to be so slow. Can you tell me again where it says those that have had contact with the relevant portion? Sure, Your Honor. The agreement is... I have different copies of it, and I'm looking back through it again. Sure. Does Your Honor have the record excerpt? Yes. So at tab 8, the very first page of tab... 7 to 7, the record excerpt. Correct. That also lists it. The very first page of tab 8, if you look at 1B, you'll see, again, it's hard to read, but it says customer, the term customer refers to any current customer of the company, including representatives of the customer, key decision makers, plant managers, purchasing agents, technical representatives, or any other employee or consultant providing services for the customer with whom I had any contact or communication or about whom I developed, received, or learned confidential information. That's the first page of tab 8, 1B. I see that. Okay. Prospective customer. For prospective customer, the term is defined right below, and it's all entities... It's all entities for whom I have assisted the company in making a written proposal within the 12 calendar months or for whom I have made at least two prospect calls. So again, it's linked to her specific contact with the customer, which is the requirement that Texas courts have established. If I could go back to the DLP report just briefly, the district court excluded it as a summary. I tend to agree with you that the district court was wrong about this agreement, that it's enforceable, certainly as to customers with which she had contact, and as I said, if you were standing in front of me injunctively, you would get it, but that didn't happen. We'll pass the 18 months. We're just now talking about damages. I don't see how the printout of the 20,000 downloads helps you prove damages, and you've got to help me be very specific about how you could have gotten to that jury with admissible evidence on damages, because that's all we're talking about here. Sure, Your Honor. I think the stat... Or stat oil. Is that the only one? That is probably the clearest example. I think there was other evidence about damages that included a comparison of GE's profits before and after, and the loss of particular GE customers to AmSpec, which GE had argued was the product of a combination of solicitation and the use of GE's confidential information, so it's... Well, you got to the jury on use of confidential information, and they found no damages, didn't they? No, Your Honor. I thought they did. To be clear, there was what we've called a mini-trial on breaches related to Ms. Moffitt-Johnson's breach of the requirement to tell GE about her future plans to compete. What we did not get to the jury on was any of our arguments about a breach of confidential information, misappropriation of confidential information, solicitation, and the like, and because those are intertwined, our damages plan and our damages expert was going to explain the loss that GE suffered as a result. All right. And so stat oil, you say she talked to him at the yacht event. Sure. And he downloaded confidential information. Which included information about... That Hagstrom got hired by the new company as well, and he was not hamstrung by non-compete agreement. So how do you show a jury some evidence that it was her breach of the agreement that caused specific sales? Sure, Your Honor. I see I'm over my time, but to respond briefly, Hagstrom, excuse me, the stat oil sale, for example, there was evidence that Ms. Moffitt-Johnson spoke with stat oil. There was evidence that stat oil treated Ms. Moffitt-Johnson as their particular point of contact, not treated Hagstrom as their point of contact. Is that the client that said, I'd have to check with Michelle first? Correct, Your Honor. And we think that, of course, indicates that they did not view Hagstrom as the point of contact, but rather Ms. Moffitt-Johnson, and that in light of her theft of GE's confidential information about stat oil, her conversations with stat oil, stat oil's perception of her as their go-to person, and the subsequent loss of sales to stat oil, that that's an example of the type of circumstantial case that GE could have put forth. I'll reserve my remaining time. May it please the Court? David Barron on behalf of Ms. Moffitt-Johnson. This case is not really about the trial court's errors. It's about GE's errors on a number of fronts. The trial court told GE at two separate injunction hearings that it was not going to grant an injunction with regard to these large multinational oil and gas companies that restricted her ability, Ms. Moffitt-Johnson's ability, to contact every single employee at these companies. GE has changed their story in the appellate court. We all agree, it sounds like, that it would be reasonable for Ms. Moffitt-Johnson to be limited from contacting people that she actually had contacted. We're past the injunction stage. Right. I understand. Now we're at the damages stage. Right. Is it your position if the agreement can possibly be construed over broadly that it's all void or you don't save any of it, or what? What I believe, Your Honor, is that if GE advocated for an interpretation of an ambiguous agreement in a way that was overly broad, that the judge did the right thing by saying your interpretation of this agreement is overly broad and I need to limit it. Now, under our— Clearly, at a minimum, the agreement prohibited her from soliciting clients with which she had had direct contact or for supervising others in soliciting clients. And there seems to be some evidence that she supervised Hagstrom while Hagstrom was soliciting former GE clients. Right. So we agree that it limited her ability to solicit certain clients. In fact, she did that. The testimony was that she was following what she believed the injunction— Is there evidence that she referred a client to Hagstrom? No. What the evidence was, Your Honor, that she told Hagstrom there are certain customers I can't talk to. So she didn't talk to those customers. The only evidence that she supervised Mr. Hagstrom that they put in the record was Mr. Hagstrom sent an email that said, I'm going to San Antonio, letting her know he was going to be out of town. And they tried to argue that somehow that was evidence that he was supervising her or him in a solicitation of Valero, who happened to be located in San Antonio. So the only evidence of any coordination or forwarding of customers were just routine types of emails about his, you know, where he's going to be. There was no evidence that she was forwarding or funneling customers to him or somehow doing anything under the table to get around her non-compete agreement. In fact, the testimony was that she tried to follow it by saying, OK, I know I can't contact these people. If something comes in with those people, you need to deal with it. And Your Honor, it's important to understand that these two businesses both did business with the same customers. In fact, the evidence was that before AmSpec got into this business, GE would actually send its marketing people to AmSpec marketing events to piggyback. So they already had lots of contacts with these customers. And going back to your issue on damages, we put into the record a long footnote of all the different contacts and relationships, for example, with Statoil, that AmSpec had irrespective of Ms. Moffitt. For example, Jack Smith testified that he had dinner with the very person that they're saying that she solicited and talked to him about cargo treatments and this new line of business. And that's why . . . That's kind of beside the point. The jury could sift through all that. Sure. I'm just asking, is there any . . . I'm just . . . my only question, is there information that the jury could get to the jury and let the jury decide? And it might be overwhelming in your favor. No. That's not the point. We're not . . . Yeah, I don't think there is. Your Honor, I think there's speculation that she talked to somebody at Statoil at a party and later on, AmSpec did business with Statoil, therefore, there must be enough to raise a fact issue. And I think the judge looked at that and said that's not enough to raise a fact issue. And I think that was the right answer. What about the strategy to cut profits in AmSpec's first year or two to gain market share? And she knew competitively what GE's prices were because she downloaded so much stuff and took it with her. Wasn't that a violation of her agreement and isn't that some evidence that she used it to gain a competitive advantage for AmSpec? Yeah. I'm glad you asked that question, Your Honor. In fact, that comes from the business plan that they're arguing is filled with trade secrets. And there's no evidence that AmSpec cut profit margin to compete with GE or anybody. In fact, all that the business plan says is get market share, not from GE. It doesn't say anything about cutting profits. How many players are in this market? I believe the evidence was that there's about six or seven, Your Honor. GE's not even the biggest. AmSpec's biggest competitors is not even GE. So, there was no specific evidence that she did anything with respect to targeting GE or using inside information from GE. The only evidence they had was this business plan, which I think when you look at it, Your Honor, it's just talking points for her interview. It has general things on there like hard-hitting team, equipment. We need equipment. We need a strong safety culture. We need a good mix of high margin and low margin business. These are just general business plans. You could use these same elements for really any business, not even the cargo treatment business. So, to say that she had a specific targeted plan to use trade secrets to go after GE, that's not evidence of that, Your Honor, and this was their best evidence that they offered to the trial court for that theory. So, I would say that that falls short of raising a fact issue on that point. I want to go back, because I think you said you were leaning against us on the non-compete agreement, and I want to try to convince you otherwise. The issue in that agreement, Your Honor, is the way it defines customer is refers to any current customer of the company, and it's vague as to whether that's the whole entity or what, including representatives of the customer whom she had contact. So, they did not argue to the district court that it was limited, like they're arguing today to me, that this is why I'm so perplexed. Correct, and that was the whole fight was that we show up at the TRO hearing and they had a list of 20-something companies, which are all the big oil and gas companies. Everybody they deal with in the whole industry she's banned from, even though she doesn't necessarily know, they did not limit it to one she had called on when they argued in the district court. Correct. That's right. I'm sorry. And that was not only the case at the TRO hearing, that was also the case at the preliminary injunction hearing. So, you tell the district court that that's your agreement, then that whole agreement has to be . . . that doesn't need to be narrowly . . . it's overbroad on its face if that's the agreement. Right. I think the agreement is subject to a number of different interpretations because it's poorly drafted. Right. But they are the master. If they had limited like they're limiting today, then you would have been in a much more difficult case. We would have had an agreed injunction. That's what we offered. I want you to pass the injunction. Okay. What happened? Right. And if you look . . . What was their position after the injunction stuff was over there? Yeah. They're ready to go to trial now. What was their position? Well, I think you have to look at the summary judgment stage because that's where the judge ruled. Okay. If you look at their brief, I would say it's woefully short of taking any position, Your Honor. They attached the Kurtz Affidavit again, which the Kurtz Affidavit was the one that you will recall had the 20-something companies that they alleged, frankly, globally, I guess, she was limited in soliciting. They didn't even make a case that it should be the entire company or only certain folks. They just sort of blew by that, and they only addressed the enforceability issue in about a page of their brief, whereas we addressed it thoroughly, and the court, I think, rightfully took their evidence . . . What was their position in the page about the enforceability issue? I'm not sure I can tell, Your Honor, to be honest with you. They basically just say . . . I'm not sure that's clear, Your Honor, and I would say that that position cannot be consistent with the Kurtz Affidavit that they actually attached, where they said, here's our interpretation of the agreement. She should be limited from soliciting these 23 companies. It didn't say the people at those 23 companies with whom she had contact in the last . . . That's my question. What was their argument? Right. I would say that their position was consistent with the Kurtz Affidavit, which is what they offered to the court, which said that she should be limited to any contacts with anybody in these 23 companies. That's what it said. And I think the court took them at their word. And I would point out that the evidence that we offered to the trial court was that those 23 companies weren't even actually companies with whom she had dealings. That list was derived from Mr. Kurtz going to his sales team and saying, who do we not want Moffitt to contact? They threw names at him. He put that on the list, gave it to the lawyers, and that's what they offered up to the court. So I think that gets into our arguments on the 1551 attorney's fees, which is that they unknowingly took a position that wasn't even within the four corners of the agreement. It was actually broader because they were advocating for her to be limited in contacting companies with whom they had no good faith basis to believe she even had contact within the 18 months under the terms of the agreement. And Mr. Kurtz testified he didn't even read the agreement before he put together the list of companies that she shouldn't be contacting. And that's what they submitted to the court as their view of what the limitations on her should be. Can you give me an example of one that she did not have a relationship with that they argued to the court on summary judgment that she should be banned from contacting? It's been a while, Your Honor. I believe Chevron was one that when we had negotiations that we had actually I think agreed to take off the list. The bigger issue was geographically many of these companies are huge companies. And where I believe they fall short on the law is that they have to have a protectable interest and they have to show that the restraint is not greater than necessary to protect that interest. So, for example, if Ms. Michelle Moffitt Johnson was involved in a cargo treatment at a refinery for Valero in San Antonio and she had nothing to do with the Valero plant up in Seattle and, in fact, GE doesn't even do business in Seattle, under what they're advocating she couldn't contact that plant in Seattle even though GE doesn't even do business there and she wouldn't. Do they advocate that? Yes. Specifically before the district court at the time of summary judgment, not at the time of injunction? Yes. I would say yes. That's what Kurt's affidavit says. That was the whole, they never changed their position. The court never understood them to have changed their position and, you know, they're now trying to change their position on appeal and say they agreed with us. You know, I think that's just very disingenuous. I want to move quickly to the DLP report before I run out of time. I think when looking at the DLP report, you know, this DLP report has two sections in it. One is a list of emails and one is a list of documents that were supposedly copied from her, Ms. Moffitt-Johnson's laptop. It has to be looked at together so if any part of that falls down then the whole document is admissible. At summary judgment stage, I believe, there's no question, that the underlying documents had not been produced or made available to us. There's some, there was a lot of dispute after that as to whether they were completely made available or when, but I don't think there's a dispute that at the time the judge ruled they were not. And just the best evidence of that that I've found, I mean, it's clear in their motion for reconsideration that they weren't produced at the time. But there was also a exchange at trial. This is actually the week before trial. What do you mean it was not produced? Well, for this to be admissible, our position is that for it to be an admissible summary, they would have had to produce or made available the emails. I find it very difficult to treat this as a summary. Okay. It looks to me very straightforward. I think that argument's off the wall, frankly, but this was, as I understand it, was simply the work of a computer that produced a set of facts, period. I don't believe that's right, Your Honor. Well, you can say what you want to, but I'm going to say what I want to. Okay. I'm just getting your hat straight away that that argument ain't selling to one judge. Okay. Well, let me ask you this, Your Honor, and I think this is a fundamental problem with the emails because they actually tried to do this at the trial court stage. They're trying to make arguments based on the subject of an email from a computer printout of the subject line and who it was to, and in fact, at the trial court, they made an argument as to what the subject was when it was wrong, and we went and found the original email and it said the opposite of what they were saying. That's basically them trying to get into hearsay, the original email, through this, you know, who it went to and what date it was, and they're trying to do the same thing in this court by arguing that there's evidence that she sent financial documents to herself. She read a download program and it generated what the download program showed, and that's just a fact of what it showed, period. Right. But it is data. You want to turn this into a 1004 or a miscibility standard on summaries and all of those trigger all of those provisions of notice and so forth, and I don't get that. Well. It doesn't need, the data that's produced is not a summary of anything. Well, but, Your Honor, the unfairness of, they had a computer program that said that Ms. Moffitt did something on her laptop, then they destroy the laptop, so we can't go back to the laptop and verify what they're saying is true. Well, I think that's spoliation. I think that's one problem. You're shifting gears on me here. I am shifting gears, Your Honor. But let me go back to your question. Let me go back to your question. I want to be fair. She has to tell you that this does not fly as a summary. Okay. Well, then it has to be a computer business record, because. You've got another argument about spoliation. That's a very distinct argument. Okay. That does not rest on the rules. That has to do more with sanction or enforcing rules of the court. Right. Well, Your Honor, so if it's not a summary, I think their argument is that it's a computer business record. And that's their best argument, that it should be admissible on that basis. And I would say that that doesn't fly either, and here's why. Their own words were that these reports were generated by intellectual property investigators, not business side employees. Why isn't that a business part and parcel of a company's business? Well, because the second criteria for a computer business record is it has to be created for litigation. I.e., not including prepared for litigation. It wasn't prepared for litigation. It's accuracy to monitor your employees to make sure they aren't giving away your trade secrets. Now, that's part of your business. We would argue, Your Honor, that the entire purpose of this was to basically to use this to catch employees in violations that they would use for litigation. No, it's to protect their business, but what's the next? I think that's one problem here. And it also has to be not itself a mere accumulation of hearsay. And I think, you know, you could at least make the argument that the record of a download is data, but the collection of the e-mails, again, we feel very strongly that's hearsay. No, it's what was in the e-mails, but it certainly is evidence that she downloaded 27,000 documents. Right. But they combine those two things together into one document. So if you find that the combination or summary of e-mails, even if it's not a summary, but the fact that that part of it is an accumulation of hearsay, which we believe it is, because It's not accumulation of hearsay. It's a fact that she downloaded documents that had these titles. Right. That's a fact. And it doesn't purport to show what's in the e-mails, but the fact that she downloaded what she downloaded is some evidence of what she downloaded. Right, but there's two separate parts of that. What you're talking about is the part of the DLP report that dealt with the downloads. There's a separate part that dealt with e-mails, and it was all in one document, Your Honor. So if the list of, it's basically just a list of e-mails is what it is. And then there's a separate, part two, that's a list of supposed downloads. The list of e-mails, our view, is just hearsay. It's a list of e-mails that were supposedly sent either to or from Ms. Moffitt. But they did offer it for the truth of the matter, Your Honor. On the e-mails, they did. They actually offered it, Your Honor, for the truth of what was in the e-mail, which is really perplexing because they didn't even actually offer it. They had the e-mail. They could have said, here's the e-mail. Where she sent financial records to herself. They didn't do that. I don't know why. They instead have a list of 10,000 e-mails and said on e-mail number 4792, where all you can see is the to and from and a subject line, that that e-mail is evidence of what was sent in the e-mail without actually showing the court what's in the e-mail. They did the same thing in the trial court, claiming that there was an e-mail where Ms. Moffitt offered a job to a GE employee, and when you pull the actual e-mail, because we dug and found it, and it's that employee resigning. It's a totally different subject than what they referenced. But there are other topics you might, you're running out of time, you might want to. Well, Your Honor, I want to spend some time on the DLP report because it really is important. The issue, in our view, is that the court could make a different ruling at trial than it did at the summary judgment stage. There were numerous other reasons at the summary judgment stage why the court could have not allowed any evidence. There's the spoliation issue, which again, in our view, is a huge one. Was that a ground? Did the district court say that was the basis for it? The judge did not, but we believe . . . You said that that's not a sanction and that's not part of the record. Well, but I believe the standard of review is that if there's any other basis for . . . Sanctions don't count. Well, they've made that argument, Your Honor, but the judge actually made a finding of spoliation at trial by giving a spoliation instruction. So we believe that given that there is an actual finding, at least at the trial stage, that there was spoliation, that that could be another alternate basis that the court could have . . . But you let it in at trial. So you made your statement coming around. She did. She did. Right. But the third reason why the judge could have not allowed it in was because of the discovery abuse. This is evidently their key piece of evidence. They waited until two weeks before an extended discovery deadline to even produce it to us. They got rid of the laptop. We specifically requested documents related to misappropriation, which clearly this is. They made a border plate objection and never gave it to us. And they're saying, well, we objected, but we didn't . . . they never told us that they were withholding it. The new federal rules specifically require that now because of games like this. So they had it for the entire duration. They never mentioned it at the injunction hearing. It's never mentioned in the pleadings. We took 12 or 15 depositions. They never mentioned it. And then all of a sudden, two weeks before discovery, here you go. And by the way, we've destroyed the laptops. There's no way to actually go back and verify anything that we're telling you. You're wrong on that, on this whole report and the misability of it. If the same argument is that you're wrong, what result? Well, I hope I'm not wrong, Your Honor. But even if I am wrong, I think, you know, our position would be that they got to submit it to the jury. They got to make every argument that they wanted to the jury. The jury still found no damages. So . . . They didn't get to submit to the jury violation of trade secrets. She stole proprietary trade secrets. She stole confidential information. They didn't get to submit that to the jury. Well, they got to put on that evidence. Now, they didn't get to submit a jury question on misappropriation. I'll give you that. But they got to actually put on all of the evidence. They questioned her on the DLP report. There wasn't a line for the jury to answer yes, she violated that, another provision in the agreement that deals with that, and answer damages. That's not in the jury charge. I agree with you, Your Honor. I'm not going to make that point. So now . . . But what I would say, though, is they put on the evidence, and the jury heard that evidence. But does it get her anywhere? So keep going. Okay. So is the answer to my question that it would have to go back on that claim, but unless we agreed with you that they argued for an overly broad interpretation, or does that have any play? Or does it have to go back on that claim anyway? Well, I think in fairness, the enforceability of the noncompete is a separate issue. So that claim has to go back, even if you win everything else? I think that's right. But again, I think our position would be that there are a number of reasons why the court should have excluded that document. Let's say . . . The court picked one. Is there evidence that that document caused damage? No. I mean, I don't believe there's evidence . . . Was it a harmless error? I would say so. Why did you say it would have to go back? Well, I didn't say it would have to go back. I think that . . . I'm asking. Well, Your Honor, just because . . . let's just say, hypothetically, this is evidence that she misappropriated 28,000 files. There's nothing to show that she actually used . . . there's nothing to show that that information actually went to the company, or that she actually used that information to compete, you know, with GE. So from that regard, I would say that it is harmless error. I see that I'm out of time. A few points, Your Honor. First, Judge Elrod, to your question about what was argued at the district court, I want to be very clear here. GE, throughout this case, has argued that the agreement is enforceable on its face and that it applies only to clients with whom Ms. Moffitt Johnston had contact. The debate at the district court is what a client consisted of. So GE . . . For example, if Valero has a Seattle Valero, are you . . . I thought your position within the Kurtz affidavit was that she couldn't talk to the Seattle person, either. Yes, Your Honor. The position is that she could not communicate with the client, and the client . . . That is too broad, and that's not the position I thought that you were . . . I thought you were saying she couldn't deal with people that she had done business with. I thought that's what you were telling me. Those are specific people. Your Honor, she had done business with the client, which is, say, Valero, and there's nothing in Texas law that says there has to be a further restriction to people who work at the client. That's why . . . Well, but certainly, Valero, Seattle versus a refinery in South Texas is very different. There could be, Your Honor, a jury question, for example, as to whether there was actually a breach of the agreement, because perhaps there hadn't been sufficient evidence to show that was her customer. You would have to argue for redlining, it seems to me, which you didn't do. In other words, you're saying, well, client means client, and that means Valero worldwide, whether she had contact with refineries or whatever worldwide. Your Honor, we think that's what Alex Shishunoff and other Texas law cases say, but again . . . Shishunoff does not say that it applies to Norway. I mean, that is just way too broad of Shishunoff. That is . . . So, Your Honor . . . It doesn't say that . . . I mean, because that's what you're saying. It applies to Norway, and that's not . . . that would be so unenforced. I mean, that's just unenforceable. Normally, the way these things work, you sit down with the trial judge, and they don't throw . . . even if it's overly broad, unless it's just on its face, totally. We do what's called redlining, and we sit down, and you take the part that is enforceable, which is the people that she had contact with, the customers, in whatever geographic region those customers were, but not customers . . . not worldwide people under the same corporate umbrella, and that didn't happen here. It didn't happen here, Your Honor, but even if Your Honors disagree on enforceability, again, at a minimum, the attorney's fees need to be reversed, and because of the error in admitting the DLP report, there were a number of claims that have nothing to do with the non-solicitation agreement, but rather have to do with misappropriation of trade secrets. I know your time is running out. Okay. The attorney's fees has to be reversed because they were too broad? They weren't tied? Your Honor, the district court made no findings as required under 15.51c, and for the reasons we've given . . . Why don't we remand for them to make the proper findings? You could do that, Your Honor, but as we've argued, there is no Texas case that says that a customer must include some narrower division of that customer. The idea that a customer is worldwide is so outside the Texas law that it's . . . and y'all did argue that throughout the case. Sure, Your Honor, but putting aside the non-solicitation agreement, the DLP report alone affects claims on the misappropriation of trade secrets, the use of confidential information, the breach of common law duty with regard to confidential information, the breach of fiduciary duty, and so forth. Did you have full discovery on those issues? We did have discovery. And what damages can you prove? Your Honor, the damages that GE was putting forth was that this client and confidential information was taken from GE . . . And used to how to their damage? And used to the tune of a million . . . How? Just give me the connection. Sure. I need the connection. GE put forth its financials and AmSpec's financials to show which clients had moved from GE to AmSpec immediately after the appropriation. It could have, Your Honor, but one of the reasonable inferences for a jury to draw would have been that this misappropriation of confidential information followed by success . . . Sure, Your Honor. One way to do this would be to introduce GE's financials, which Ms. Moffitt Johnston took under the DLP report, followed by AmSpec's financials, which are, again, in the record at 5906 to 5975 . . . How's that going to . . . And . . . How will that make a customer switch? And GE would be able to argue that, look, she took our financials and knows what profit margin we've been using with, say, Valero. Now, AmSpec comes in with a lower profit margin. You have to show that. You have to show that they actually used the confidential . . . or create at least an inference that they had a different profit, and it's my understanding the evidence did not include that inference. Your Honor, GE was not allowed to argue for that because the district court excluded the DLP report in her analysis. But the DLP doesn't say that, though, that they actually calculated the price that they would sell the . . . do the deal at a cheaper rate in order to beat the GE rate. There's not that link. Of course, the DLP report does not say that specifically, but it offers circumstantial evidence. It shows both margins. It shows very suspicious timing. It shows Ms. Moffitt Johnston took 27,000 documents from GE full of highly confidential information and then shortly thereafter has success with those precise clients at numbers that we're able to show to a jury. And that's sufficient circumstantial evidence that a jury should have been able to decide. Your argument is it's just a recreational activity. Excuse me, Your Honor? I said your argument is that Ms. Moffitt wasn't engaged in a little recreational activity. Correct. And that's what the Texas court has said in the . . . I'm upset. That's what's going on here. The Air Molina case. That's really suspicious circumstances of theft of secrets are often sufficient to demonstrate use because an employee is unlikely to take a box of secrets without intending to actually use them. Thank you, Your Honors.